UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EDF RENEWABLE DEVELOPMENT. INC.,

                                                    FINDINGS OF FACT AND
                                                    CONCLUSIONS OF LAW

                        Plaintiff,                  CV 13-3361

                -against-                           (Shields, MJ.)

COUNTY OF SUFFOLK,

                        Defendant.
--------------------------------------------------------X
APPEARANCES:

        BLANK ROME, LLP
        BY: HARRIS N. COGAN, ESQ.
            BRUCE MICHAEL GORMAN, JR., ESQ.
            RITHER ALABRE, ESQ.
        Attorneys for Plaintiff
        405 Lexington Avenue
        New York, New York 10174

        DENNIS M. BROWN, ESQ., SUFFOLK COUNTY ATTORNEY
        BY: JOHN RICHARD PETROWSKI, ESQ., MEGAN O'DONNELL, ESQ.,
        ASSISTANT COUNTY ATTORNEYS
        100 Veterans Memorial Highway
        P.O. Box 6100
        Hauppauge, New York 11788
        Attorneys for Defendant

SHIELDS, Magistrate Judge,

        Plaintiff EDF Renewable Development, Inc. commenced this action on or about June 12,

2013, against Defendant County of Suffolk alleging claims for breach of contract, promissory

estoppel and breach of the covenant of good faith and fair dealing.  After completion of

discovery and the denial of cross-motions for summary judgment, see Docket Entry ("DE") Nos.

36, 40 and 43, the parties consented to the jurisdiction of this Court for all purposes.  DE 51-52.

1

A non-jury trial commenced on May 9, 2016 and concluded on May 13, 2016. DE 61-66. On

June 30, 2016, the parties submitted proposed findings of fact and conclusions of law. DE 67

and 68. Upon consideration of those submissions and the proceedings herein, this constitutes the

Court's Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

I.  <u>The Parties and the Witnesses Who Testified at the Trial</u>

1. Plaintiff EDF Renewable Development, Inc. ("EDF") is a company located in San Diego, California that has been engaged in the renewable energy business. EDF's business ventures have, over time, included solar energy and wind energy programs. Nolan Tr. 35-36.

2. EDF's corporate predecessor was known as enXco Development Corporation ("enXco"). enXco owned membership interests in Eastern Long Island Solar Project, LLP ("ELISP"). ELISP is the corporate entity that entered into the contract with the County of Suffolk (the "County") that forms the basis of this lawsuit.

3. While EDF has sold its ownership interest in ELISP, ELISP has assigned its rights in the contractual claims herein to EDF. For convenience, this Court refers to the contracting party (and the Plaintiff herein) as EDF. Throughout the trial the parties referred to EDF when referring to the actions of its corporate predecessor, enXco. This Court similarly refers herein to EDF to encompass references to the acts of its predecessor corporate entity.

4. EDF presented the factual testimony of: (1) Gerard Nolan ("Nolan") and (2) Lee Connor ("Connor"). Nolan and Connor both served as EDF Project Managers for the overall project forming the basis of this lawsuit as well as earlier completed projects. They had

personal knowledge of all aspects of the projects and exercised hands-on control over all aspects thereof. EDF also presented the factual testimony of Keith Feldmann, a principle of Eldor Contracting Corporation ("Eldor"). Eldor is an electrical construction company that served, essentially, as the general contractor for the project forming the basis of this action.

5. The County presented the factual testimony of: (1) Michael Monaghan ("Monaghan"), Llewelyn Johnson ("Johnson") and Robert Hardie ("Hardie"). Monaghan, Johnson and Hardie were all employees of the County working at the Suffolk County Department of Public Works ("DPW") on the project forming the basis of this lawsuit during the relevant time period.

6. The County also presented the factual testimony of Lisa Broughton ("Broughton"). Broughton was employed as the Director of the Suffolk County Department of Energy during the relevant time period. Like Nolan and Connor, Monaghan, Johnson, Hardie and Broughton had personal involvement and knowledge of the project at issue.

7. The County's final factual witness was Dennis Brown, Esq. ("Brown"). Brown was employed as the Chief Deputy County Executive to Suffolk County Executive Steven Bellone ("Bellone"). Cohen assumed this position when Bellone became the Suffolk County Executive in January of 2012.

8. EDF presented the expert testimony of Maryellen Sebold ("Sebold'), a Certified Public Accountant and a Managing Director at the consulting firm of BDO USA, LLP.

9. The County presented the expert testimony of James Smith ("Smith"), a professor at Stony Brook University and a consultant with Bison Technology Corporation.

10. The Court has reviewed the credentials of both Sebold and Smith and holds that both were properly qualified as experts and competent to offer expert testimony in this matter. The Court gives weight to the testimony of each of these witnesses as described below.

II.   EDF's Contract with LIPA: The Power Purchase Agreement

11. In or around 2008, EDF responded to a request for proposals issued by the Long Island Power Authority ("LIPA") to generate up to 20 megawatts of solar power on Long Island (the "2008 RFP"). EDF was the successful bidder in the 2008 RFP.

12. In January of 2010, pursuant to the solar power generation envisioned by the 2008 RFP, EDF and LIPA entered into a 20-year contract for the sale of electricity to be produced by EDF and sold to LIPA (the "Power Purchase Agreement" or the "PPA"). The Power Purchase Agreement gave EDF the right to sell electricity – measured in megawatts ("MW") – to LIPA. See Contract for the Purchase and Sale of Solar Energy, Renewable Energy Certificates and Capacity Between Long Island Power Authority and Eastern Long Island Solar Project, LLC, dated January 27, 2010. Plaintiff's Trial Exhibit ("Pl. Exh.") 1, 25.

13. As extended and amended, the Power Purchase Agreement set a final deadline of December 31, 2012 for EDF to complete its installation of solar panels to generate the electricity envisioned by the PPA. Nolan Tr. 39.

14. EDF planned to generate the power called for in the PPA by installing solar panels as carports in parking lots.  Thus, EDF needed to locate appropriate sites to host those carports.

15. In 2009, after becoming aware of the opportunity to be involved in the solar energy project envisioned by the PPA, the County applied to act as a host site for the erection of the EDF solar panel carports. Broughton Tr. 546-47.

16. The County was an ardent supporter of the carport project. Broughton Tr. 580. The project would not only foster green environment concerns but, in addition, the leasing of County-owned land to EDF would result in the overall generation of approximately $10 million in rental payments. Broughton Tr. 581.

III. The Lease Agreements between EDF and the County

17. While the County initially envisioned construction of solar carports only at the parking lot at its H. Lee Dennison municipal building in Hauppauge, New York, it thereafter engaged in discussions with EDF to construct carports at other parking lots located throughout the County, including LIRR parking lots. Broughton Tr. 548; Nolan Tr. 43.

18. It was ultimately agreed that solar panel carports would be constructed by EDF at seven parking lots located on land owned by the County. Thereafter, EDF entered into seven separate lease agreements with the County allowing EDF to construct solar panel carports on County owned land (the "Lease Agreements"). See Nolan Tr. 43-44.

19. The seven sites where solar panel carports were to be installed pursuant to the Lease Agreements were referred to at trial as: (1) Brentwood; (2) North Country; (3) the Cohalan Court Complex; (4) Riverhead; (5) the Dennison Building; (6) Deer Park, and (7) Ronkonkoma (collectively the "Carport Sites").

20. While separate agreements were entered into for each of the Carport Sites, the Lease Agreements were all dated March 22, 2010, were for terms of twenty years, and contained identical substantive provisions. See, e.g., Pl. Exh. 4 (Lease Agreement

pertaining to Cohalan Court Complex; Pl. Exh. 5 (Lease Agreement pertaining to Ronkonkoma LIRR Station); Pl. Exh. 6 (Lease Agreement pertaining to Deer Park LIRR Station); Nolan Tr. 74.

21. The lease agreement that is the subject of this lawsuit is the agreement entered into between EDF and the County to construct solar panel carports at the Ronkonkoma LIRR station parking lot (the "Ronkonkoma Lease Agreement"). Pl. Exh. 5.

22. Among the parties' contractual obligations as set forth in each of the Lease Agreements, including the Ronkonkoma Lease Agreement, was the contractual duty to cooperate as set forth in Section 35 of each of the Lease Agreements and discussed in greater detail below ("Section 35"). See, e.g., Pl. Exhs. 4, 5, 6 at 28.

IV. EDF's Purchases of Solar Panels and Steel for the Carport Project

23. In order to fulfill its obligations under the Lease Agreements, EDF was required to purchase solar panels and steel to be used in construction. These materials were ordered and purchased by EDF after the signing of the Lease Agreements, but prior to the issuance of any building permits. Nolan Tr. 51; Connor Tr. 254.

24. Ensuring a sufficient amount of solar panels for construction was important for EDF because, at or around the execution of the 2010 Lease Agreements, there was a global shortage of such panels. Nolan Tr. 52; Connor Tr. 255.

25. While the County took the position that no such global shortage existed, the Court finds, based upon the evidence and documents presented, that it was reasonable for EDF to believe that such a shortage existed in 2010 when the Lease Agreements were executed.

26. In view of the global shortage in solar panels, and to take advantage of economies of scale, EDF made the decision to purchase solar panels pursuant to a Master Sales

Agreement, also referred to as a "Frame" agreement, with a company known as "Suntech." Suntech was a manufacturer of solar panels. <u>See</u> Nolan Tr. 53.

27. EDF's Frame Agreement with Suntech not only locked in a particular price, but also ensured that EDF would have a sufficient number of solar panels on hand to complete carport construction once building permits were issued. Nolan Tr. 51; Exh. 97; <u>see</u> Connor Tr. 255.

28. Nolan exercised his business judgment when entering into the Frame Agreement for solar panels. That judgment was reached based upon Nolan's prior business experience as well as his knowledge of the solar panel market, including issues of price and the probable availability of such panels at or around the time of execution of the Lease Agreements. Nolan Tr. 53-54; 60.

29. If EDF waited until the issuance of building permits to order solar panels, such panels might not have been available in enough time to timely complete construction. Nolan Tr. 60; Connor Tr. 256-57.

30. EDF's decision to order solar panels prior to the issuance of building permits to begin carport construction proved to be the correct decision at the time. This was evidenced by difficulties experienced by EDF in obtaining solar panels from Suntech, even after execution of the Frame Agreement. While Suntech eventually performed under the Frame Agreement and delivered the solar panels requested by EDF, its initial refusal to do so is evidence of the global shortage and the "tight market" for solar panels as referenced by Nolan. Nolan Tr. 57-59; Exh. 8.

31. In addition to purchasing solar panels, EDF also purchased steel for use in carport construction prior to the issuance of building permits. Such purchases were made by

EDF to avoid a price increase in the cost of this commodity. Nolan Tr. 51; Connor Tr. 256.

V.    The Building Permit Application Process and the Parties' Course of Dealing

32. Building permits for each of the Carport Sites were necessary for construction to begin and to be completed. Such permits were issued by DPW, the local authority with legal jurisdiction to issue such permits. Monaghan Tr. 411.

33. EDF representatives Nolan and Connor regularly interacted with DPW and other County employees in connection with the building permitting process for each of the Carport Sites. Those County employees included Broughton, Monaghan, Johnson and Hardie. The latter three employees were, at all relevant times and as discussed below, DPW employees.

34. The DPW employee who was initially chiefly responsible for oversight of the building permit process was Monaghan, the County's Chief Engineer at the relevant time. Monaghan Tr. 413; see Broughton Tr. 553. During the permitting process with respect to Brentwood, the first site built, Monaghan had direct hands-on responsibility and interacted intensively with Nolan.

35. As Carport Sites were constructed after Brentwood, Monaghan delegated many oversight duties and decisions to Johnson, a DPW employee who served as an Assistant County Architect. As an Assistant County Architect, Johnson was responsible for evaluating designs and applications for building permits, including the permits for the solar carport sites. Johnson Tr. 636. Johnson was assisted by DPW Project Manager Hardie, who often acted as a liaison between EDF, its subcontractors, and the County.

36. EDF also interacted with Broughton who then held the title of Suffolk County Energy Director/Bio and High Tech Development Specialist. Broughton Tr. 545.

37. With the exception of the permitting process at the Ronkonkoma LIRR station parking lot (the "Ronkonkoma Site"), the dialogue among the County (as represented by Monaghan, Johnson, Hardie and Broughton), EDF (as represented by Nolan and Connor), Eldor (as represented by Feldmann) and other stakeholder/subcontractors was open, collaborative and responsive. E.g., Feldmann Tr. 215. Connor Tr. 258; Nolan Tr. 48.

38. In particular, the building permitting process with respect to all Carport Sites that preceded the Ronkonkoma Site was characterized by swift response time and turnaround of building permits, allowing each carport construction project to proceed swiftly.

39. The first step in the building permit application process for each of the Carport Sites was the submission of an initial building permit. Johnson Tr. 643. This first step was taken uniformly with respect to all sites, including the Ronkonkoma Site. Such initial permits were submitted in or around late 2010/early 2011. Johnson Tr. 636. These initial permits were submitted so as to "grandfather in" the soon to be changed 2007 building code. Monaghan Tr. 418.

40. After the initial building permit applications were submitted, EDF submitted separate building permit applications for each Carport Site. It became clear at trial that the County and EDF quickly developed a course of dealing marked by a collaborative process.

41. First, for each site, DPW would review the applications and promptly communicate any comments to EDF for revision. Johnson Tr. 643. With the exception of the Ronkonkoma Site, DPW reviewed each building permit and promptly communicated its comments to EDF. Typically, such comments would be communicated via a "redline" copy of the

application setting forth any County concerns. EDF would review the redlined comments and then promptly respond to all concerns. Nolan Tr. 48; Connor Tr. 258.

42. The parties' conduct prior to the Ronkonkoma Site was also marked by ongoing and regular communication. Thus, representatives from the County, EDF and, at times Eldor and other subcontractors, would meet, generally via teleconference call, to go over any specific needs and changes for the particular site under discussion.

43. Typical early construction at the carport sites involved what was referred to as "early trenching." Such early trenching involved the digging of trenches for placement of underground wiring. Feldmann Tr. 223; Nolan Tr. 62-63. While trenching did not always take place prior to issuance of a building permit, the County did allow for such trenching to take place at certain sites prior to issuance of a building permit. Connor Tr. 266.

44. Whether or not early trenching was allowed, it is clear to the Court that it was the County's practice to allow carport construction to begin prior to EDF addressing each and every concern raised by DPW with respect to construction.

45. The document allowing construction to begin was issuance of a permit, often referred to at trial as a "trenching permit" which would allow construction to begin with the understanding that certain specified conditions would be met. See Connor Tr. 259, 266, 272-73.

46. While certain witnesses referred to the document allowing for construction to begin as a "conditional" or "trenching" permit, no such separate permit was introduced at trial, and no such document appears to exist. Instead, the Court finds that what the witnesses referred to as either "conditional" or "trenching" permits were, in fact, building permits

issued with conditions attached.  See Monaghan Tr. 420; 427; 467; Nolan Tr. 63. Such conditions were referred to as "special conditions."

47. While it was not clear that a building permit with "special conditions" is a process that was followed by the County with respect to all County construction projects, it is clear to the Court that the issuance of such "interim" permits (which allowed construction of carports to begin prior to EDF addressing all of the County's concerns), constituted the normal course of dealing between EDF and the County with respect to the construction and installation of solar panels at the Carport Sites pursuant to the Lease Agreements. Monaghan Tr. 420; 467; Connor Tr. 259.

48. With the exception of the Ronkonkoma Site, the County issued permits that allowed construction to begin prior to the time when EDF addressed all concerns raised by DPW. Such permits were issued between two and four weeks after EDF's submission of its initial plans. Monaghan Tr. 468; Connor Tr. 260; Nolan Tr. 66-67; Pl. Exhs. 11-17. Thus, for example, the building permit for the Dennison site was submitted on June 29, 2011 and issued on July 27, 2011.  The North County permit application was submitted on June 27, 2011 and a building permit was issued on August 11, 2011. Pl. Exhs. 14-17.

VI.  The Parties' Course of Dealing with Respect To Site-Specific Concerns

49. The collaborative process that marked the parties' dealing became evident when witnesses testified as to the different challenges presented by carport construction at the various sites. For example, carport construction at the Cohalan site presented a problem with respect to the continuing placement of security cameras. See Broughton Tr. 552. Commuter parking at the Deer Park LIRR station presented a problem as to providing an

alternative parking site during construction. Broughton Tr. 569. Parking issues were also presented with respect to the Riverhead site. Monaghan Tr. 424.

50. The parties' course of dealing with respect to the Lease Agreements in general, and the Deer Park site in particular, is particularly instructive and representative of the parties' course of dealing with respect to carport construction and the claims herein. This is because Deer Park, like Ronkonkoma (the carport construction project forming the basis of this lawsuit), was a carport construction project to be located at a large and oversubscribed LIRR parking lot. Feldmann Tr. 239; 241.

51. Deer Park and Ronkonkoma presented similar challenges with respect to providing alternative parking so as not to inconvenience commuters during construction. Thus, even prior to carport construction, commuters using these LIRR parking lots had difficulty finding parking spots. Construction of carports at each of these sites therefore presented the issue of where to locate convenient and sufficient alternative parking.

52. It was EDF's responsibility to provide a plan for alternative parking during construction. This plan was referred to as a "parking mitigation" plan. Agreement as to an appropriate parking mitigation plan, like all other construction issues, required the parties to engage in a collaborative and cooperative process.

53. The parking issue was resolved at Deer Park by the use of a vacant parcel of land as a temporary parking lot. That parcel of land was adjacent to the Deer Park LIRR station parking lot. Monaghan Tr. 448-49; Broughton Tr. 570-71.

54. The parcel of land used for alternative parking at the Deer Park station was provided by the County. The use of this adjacent parking lot took place without the parties entering into any additional lease arrangement. See Broughton Tr. 570-71. Monaghan Tr. 449.

55. Construction of the carports at the Deer Park LIRR station parking lot was allowed to begin prior to the parties' reaching agreement as the final parking mitigation plan. Instead, the provision of an alternative parking site was made a special condition upon which the permit for the Deer Park site was granted. Feldmann Tr. 242-43; Monaghan Tr. 519; Johnson Tr. 678-79; Nolan Tr. 105.

56. The plan for alternative parking at the Deer Park site was not submitted until seven weeks after the permit for that site was issued. Feldmann Tr. 243.

57. Carport construction pursuant to the Lease Agreements, for all but the Ronkonkoma Site, was completed. Thus, with the exception of the Ronkonkoma Site, there are now carport solar panel arrays over each of the Carport Sites. As this litigation arises out of the parties' conduct with respect to the installation of solar panel carports at the Ronkonkoma Site, the Court turns to a detailed factual discussion of the parties' conduct with respect to that site.

VII. The Ronkonkoma Site

58. Like all other Carport Sites, the parties' conduct with respect to the installation of solar carport panels at the Ronkonkoma Site was governed by a lease agreement entered into in March of 2010. Exh. 5.

59. The Ronkonkoma Site was the largest carport construction project of the seven projects agreed to under the Lease Agreements. The percentage of megawatts to be generated at the Ronkonkoma site was approximately one third of the overall power to be generated under the PPA. Nolan Tr. 70; Connor Tr. 260.

60. Feldmann, a subpoenaed witness, testified credibly that the process and the parties' conduct with respect to the early stages of the building permit application process at the

Ronkonkoma Site was essentially the same conduct as with respect to the other sites, until the Ronkonkoma project stalled. Feldmann Tr. 222; 235; 237; 238; 243.

61. The Court finds, as a matter of fact and its own evaluation of witness credibility, that all factual witnesses similarly testified credibly as to the relative uniformity and collaborative nature of the permitting process with respect to all of the Carport Sites where construction was ultimately completed. See, e.g., Connor Tr. 260; Nolan Tr. 48; Monaghan Tr. 457-58; Broughton Tr. 554; Johnson Tr. 667.

62. While the Ronkonkoma Site was never completed, the parties recognized early in the process that issue of alternative parking would be particularly challenging at the Ronkonkoma LIRR station which, like the Deer Park LIRR station, was oversubscribed. See Broughton Tr. 587.

63. Recognizing the parking challenges presented, the parties began discussion of alternative parking sites early in the process. Thus, as early as 2010-2011, the parties began to discuss and collaborate as to a parking mitigation plan. Early discussions were held with Hanson Wood of EDF, who participated in discussions regarding several early ideas for alternative parking. Nolan was also involved in EDF's efforts to secure adequate parking during construction. Early ideas for alternative parking included suggestions for shuttle buses from Islip airport parking fields and the rental of parking spots in nearby commercial parking lots. Broughton Tr. 587; Nolan Tr. 73

64. Toward the latter part of 2011, and continuing thereafter, the parties focused only on the use of a parking lot adjacent to the Ronkonkoma LIRR station as the parking mitigation plan for the Ronkonkoma site (the "Adjacent Parcel"). Broughton Tr. 598-99.

65. The idea of using the Adjacent Parcel was suggested by the County. Nolan Tr. 77. After the County suggested use of that parcel of land, EDF reasonably focused on use of that lot, reasonably relied on assurances by the County as to its use, and therefore ceased efforts to obtain a different site for commuter parking during construction at Ronkonkoma. Nolan Tr. 78.

66. The parties agreed that EDF would incur the expense of clearing the Adjacent Parcel and making it appropriate for use as a parking lot. Broughton Tr. 591; 599; Monaghan Tr. 480; Nolan Tr. 79. The parties discussed, and it was EDF's reasonable belief, that after completion of construction the Adjacent Parcel would revert back to County control for use as a sewage treatment plant. Nolan Tr. 79.

67. In December of 2011, the parties also began working toward drafting and execution of a lease amendment setting forth the parties' obligations with respect to the clearing, use and eventual post-construction turnover of the Adjacent Parcel back to the County (the "Lease Amendment'). See Broughton Tr. 596-96; Connor Tr. 263.

68. EDF's belief that the Adjacent Parcel was agreed to serve as the alternative parking lot during construction was particularly reasonable in light of the County's efforts to secure any necessary environmental approval for the use of that parcel of land.

69. The County supported such environmental approval in a presentation made on October 19, 2011 by Hardie and Monaghan to the Council on Environmental Quality. That presentation sought that agency's support of the use of the Adjacent Parcel as an alternative parking lot. Pl. Exh. 18; See Monaghan Tr. 478-79; Hardie Tr. 708; Connor Tr. 262-63.

70. In accord with prior practice, the parties collaborated in the building permit process to allow construction to begin at the Ronkonkoma Site in tandem with their efforts with respect to the Adjacent Parcel.

71. On January 30, 2012, EDF's electrical sub-contractor Sigma Energy ("Sigma") submitted electrical AC and DC design drawings to DPW. Such drawings were submitted in furtherance of EDF's request to perform early trenching at the Ronkonkoma Site. See Exh. 75.

72. On February 13, 2012, in accord with prior practice, EDF submitted its final set of building permit plans to the DPW. Exh. 40; Nolan Tr. 82; Hardie Tr. 701-02. Those plans were reviewed by Johnson. Exh. 41; Johnson Tr. 657-58.

73. After reviewing EDF's February 2012 submission, Johnson prepared a building permit for the Ronkonkoma Site dated March 12, 2012 (the "March 2012 Permit"). Johnson Tr. 661. Similar to the course of conduct established with respect to earlier permits, the March 2012 Permit was drafted within 30 days of EDF's building permit submission. Like prior building permits issued for earlier carport sites, the March 2012 Permit listed special conditions to be met.

74. In addition to drafting the March 2012 Permit, Johnson also drafted a cover letter for that permit. The cover letter was drafted by Johnson for signature by James Ingenito, the person to whom Johnson reported. Johnson Tr. 672. The cover letter referred to EDF's plans, stated that such plans had been reviewed, and that a building permit with conditions was being issued. Johnson Tr. 672; Pl. Exh. 44.

75. Among the special conditions to be met as set forth in the March 2012 Permit were the requirements that EDF provide a site plan for alternative parking during construction and a phasing plan for the use and implementation of such parking. Johnson Tr. 662-63.

76. EDF reasonably believed, based upon its interaction and prior course of dealing with the County and DPW, that the parking issue would be resolved by the provision of alternative parking at the Adjacent Parcel, and that the Lease Amendment would be executed. Broughton Tr. 598. Indeed, Broughton was working on the language for the Lease Amendment, as was Monaghan. Broughton Tr. 596; Connor Tr. 263-64.

77. The attachment of a special condition for alternative parking at Ronkonkoma would have been similar to a special condition attached to the Deer Park building permit. Not only did the two sites present similar parking challenges (as discussed above) DPW considered and approved the Deer Park building permit during the same time frame that it was preparing the March 2012 Permit. Thus, the Deer Park building permit was issued on March 7, 2012 – five days before Johnson dated the March 12 Permit for the Ronkonkoma Site. Johnson Tr. 679; P; Exh. 42 (Deer Park permit); see Connor Tr. 284. While the Deer Park building permit with the special condition of providing alternative parking was issued, the Ronkonkoma permit was not.

78. Although Johnson drafted the March 2012 Permit (which, like the other sites contained special conditions to be fulfilled) neither he nor any other DPW employee took further action and, with the exception of vague assertions as to the permit's insufficiency, engaged in no detailed or meaningful follow-up discussions with EDF with respect to that permit. Johnson Tr. 665; Hardie Tr. 710; Nolan Tr. 85. Although Johnson drafted areas for discussion with EDF, see Exh. 41, the document containing those comments was

never given to EDF or it contractors, nor were the issues raised therein discussed with EDF. Johnson Tr. 689.

79. The County neither issued a building permit nor a denial thereof with respect to the Ronkonkoma Site. Nor did the County ever inform EDF that it was cancelling the contract for the Ronkonkoma Site.  <u>See</u> Connor Tr. 327. Instead, as discussed in detail below, the project became permanently stalled by the County and failed to go forward.

80. By June of 2012, it became clear to EDF that they would not be able to construct solar panel carports at the Ronkonkoma Site in time to comply with their obligations under the PPA.  Connor Tr. 282-83; Nolan Tr. 109.

81. The Court finds, as a matter of fact, that the County's failure to discuss its comments on the Ronkonkoma building permit with EDF, with an eye toward arriving at a mutually agreeable solution, marked a clear departure from the cooperative and collaborative prior practice of the County with respect to the six Carport Sites that were completed.

82. The reason for the County's change in practice was the fact that its newly elected 2012 administration made the decision not to go forward with construction at the Ronkonkoma Site, as discussed below.

V.    <u>The 2012 Change in County Administration and the Decision to Stop the Project</u>

83. At or around the time the 2010 Ronkonkoma Lease Agreement was entered into, the County was aware that there was a development project being considered for construction near the Ronkonkoma LIRR solar carport project. That project was referred to at trial as the Ronkonkoma commercial hub project.  Broughton Tr. 585.

84. Prior to 2012, and during all aspects of the solar carport construction projects at the various sites, the County government was headed by County Executive Steve Levy.

While the Levy administration was in office, those working on the Carport Project understood that the Ronkonkoma Site would go forward and that the Adjacent Parcel would be used for as the alternative parking site during construction.  Broughton Tr. 591.

85. The real estate developer for the Ronkonkoma hub project was opposed to the installation of solar panel carports at the Ronkonkoma LIRR parking lot. The developer's position was made clear to the Levy administration when it asked that administration to discontinue the Ronkonkoma carport project.  Brought Tr. 615-17.  The Levy administration did not grant that request.  Broughton Tr. 618; see Exh. 68.

86. In January of 2012, the Levy administration was no longer in office, and a new administration began, under the leadership of the newly elected County Executive Bellone.

87. In mid-January of 2012, Bellone met with the developer of the Ronkonkoma hub, along with then Brookhaven Town Supervisor Mark Lesko, and then County Attorney Dennis Cohen (the "January 2012 Meeting"). Cohen Tr. 819. Cohen testified credibly at trial as to the sum and substance of that meeting.

88. At the January 2012 Meeting, Lesko asked Bellone if he would support not going forward with the Ronkonkoma carport project.  Cohen Tr. 819-20. Bellone responded that he would support Lesko's request, and would therefore not support the Ronkonkoma carport project. Cohen Tr. 820; Broughton Tr. 618-19; Monaghan Tr. 484.

89. At the time of the January 2012 Meeting, Cohen was unaware that there was already a contract in place between EDF and the County for carport construction at the Ronkonkoma Site. Cohen Tr. 820.

90. After informing Broughton that the Ronkonkoma project was not going forward, Cohen became aware that there was a contract in place for that project. Cohen Tr. 823-825; 861. Cohen thereafter reviewed the Ronkonkoma Lease Agreement, including the agreement to cooperate in the permitting process. Cohen Tr. 826.

91. Knowledge of existence of the Ronkonkoma Lease Agreement did not change the County Executive's agreement to the Brookhaven Supervisor's request that the County not go forward with the project. Cohen Tr. 856.

92. While the Bellone administration did not immediately make clear its opposition to the Ronkonkoma carport project, those working on the project when the turnover in administration took place were later made aware that the Ronkonkoma project would not go forward. See Monaghan Tr. 477; 487-88.

93. By mid to late January 2012, it became gradually clearer to those County employees working on the Ronkonkoma carport project that the Bellone administration had concerns with respect to the installation of solar carports at Ronkonkoma, and that a decision was made not to go forward with that project. See Broughton Tr. 599-600; Cohen Tr. 823.

94. Early 2012 confusion among County workers as to the status of the Ronkonkoma project is evidenced by witness testimony and emails generated during January and February of 2012. See Broughton Tr. 600; 611-12. For example, in a January 23, 2012 email to Dennis Cohen, Broughton expressed her confusion and inability to communicate a clear County position to EDF. In response, Cohen told Broughton that the Ronkonkoma project would not go forward. Broughton Tr. 604.

95. County employee emails during January and February 2012 reveal a departure from the parties' prior course of collaborative dealing, open communication and a commitment to the completion of construction under the Lease Agreements.

96. The witness testimony makes clear that while the Bellone administration reached the decision not to go forward with the Ronkonkoma construction at the January 2012 Meeting, that intent was not promptly communicated to EDF. Broughton Tr. 604-05; Cohen Tr. 864.

97. Beginning in January of 2012, the County entered into a program of intentionally stalling the Ronkonkoma project and failing to communicate with EDF. See Monaghan Tr. 490; Pl. Exh. 62; Monaghan Tr. 491-92. Thus, the County no longer participated in weekly status calls with EDF, and failed to respond the telephone calls and emails. Connor Tr. 270.

98. Although the County began stalling the Ronkonkoma project, EDF continued to perform under the Lease Agreement for that project, and in accord with the parties' prior practice with respect to the six other carport sites. Thus, as noted, on January 30, 2012, EDF's electrical sub-contractor Sigma submitted electrical AC and DC design drawings. See Exh. 75.

99. On February 12, 2012, in further performance of its contractual obligations, EDF submitted its full permit package to DPW. EDF also continually sought the County's comments and/or final approval for the Lease Amendment that would allow EDF to prepare the proposed alternative site for parking during construction. While EDF acted expeditiously and in good faith to further the Ronkonkoma project, the County acted only to stall the project, as discussed below.

100.    The County began putting off questions raised by EDF and cancelled telephone conferences. Broughton Tr. 605-06.  Indeed, Broughton began screening her calls so as not to speak with Connor. Broughton Tr. 609.

101.    On February 3, 2012, then County Chief Deputy DPW Commissioner James Peterman sent an email to Dennis Cohen stating his similar avoidance of calls from EDF. Thus Peterman stated that EDF had been calling "constantly," and that he didn't have "any more delay tactics left to use."  Pl. Exh. 65; Broughton Tr. 611-12.

102.    While Broughton was avoiding calls from EDF, she sought direction from Cohen and the County Attorney's office as to how to handle EDF. Broughton was instructed to refer EDF's questions to the County Attorney's office.  Broughton Tr. 607-08.

103.    Monaghan was similarly advised that any questions with respect to the Ronkonkoma Site were to be referred to the County Attorney's office. Monaghan Tr. 477.

104.    On or about February 16, 2012, Monaghan received an email from Lee Connor inquiring about the permit for Ronkonkoma.  Monaghan was surprised to receive that email, and surprised that EDF had not been told that Ronkonkoma was "off the table." Def. Exh. DD, at 19793-794; Monaghan Tr. 516.

105.    Cohen advised County employees not to issue any permits until a decision was made by the County Executive. Cohen Tr. 836.

106.    Cohen believes that he advised EDF that the Ronkonkoma project was not going forward at a meeting held with Connor and Nolan on February 10, 2012. Cohen Tr. 832. Cohen testified that it was at that meeting when he advised EDF that the County would prefer to construct carports at an alternative location. Cohen Tr. 832-33.

107.     While Cohen testified that a meeting with Connor and Nolan took place on February 10, 2012, the trial testimony and documents reveal that instead of an in-person meeting, Cohen may have had a telephone conference with Connor on that date and that Connor had discussions with Nolan prior to the teleconference. See Exh. 71. No in person meeting took place until March 2, 2012.

108.     During the February 10, 2012 telephone conference, Cohen told Connor that the County was not breaching any agreement, but simply having discussions.  Exh. 71.

109.     No County representative ever told EDF that it could not use the Adjacent Parcel for alternative parking during the Ronkonkoma construction. Cohen Tr. 873.

110.     No County employee engaged in any meaningful collaborative process with respect to any concerns as to the phasing of the Ronkonkoma project.

111.     During February of 2012, EDF repeatedly contacted the County for input as to: (1) the status of the County's review of the early trenching request submitted on January 30, 2012; see Pl. Exh. 60; (2)  the status of the Lease Amendment, see Exh. 64 (email from Lee Connor to Lisa Broughton regarding the lease amendment), and (3) the status of the full permit request that was submitted on February 12, 2012. See Exh. 75. While the County responded sporadically with comments, and EDF and its contractors sought to address the County's concerns, there was no meaningful follow-up by the County as to any alleged concerns.

112.     The Court finds that while the issues raised by the County with respect to the phasing of parking may have been legitimate, they were the type of issues that were typically raised and dealt with after issuance of building permits with special conditions. The Court further finds that such issues were raised as part of the County's overall

stalling tactic to avoid issuance of a building permit for the installation of carports at the Ronkonkoma Site. The Court also finds, as a matter of fact, that after the January 2012 meeting with the Ronkonkoma hub developer and the Brookhaven Town Supervisor, the County made the decision that, whatever the status of information provided by EDF, it would neither agree to the signing of the Lease Amendment nor issuance of a building permit to allow construction of carports at the Ronkonkoma Site.

113.    The first in-person meeting where the county expressed its "preference" not to go forward with construction at Ronkonkoma took place on March 2, 2012.[1]

114.    The in-person meeting that took place on March 2, 2012 was attended by Cohen, Nolan and Vanessa Baird-Streeter ("Baird-Streeter"). Baird-Streeter was the Director of Communications for the Suffolk County Executive Office. Baird-Streeter had not previously been involved with the Carport Project. Nolan Tr. 94.

115.    It was at the March 2, 2012 meeting that Cohen first communicated to EDF that the County would "prefer" not to go forward with the carport project at Ronkonkoma. Nolan Tr. 95. No witness testified that the County stated its refusal to go forward with the Ronkonkoma site, but only that the County "preferred" that the project not go forward. See Nolan Tr. 95; 96.

116.    The Court finds that the March 2, 2012 meeting was not held to communicate to EDF any particular concerns of the County regarding the terms of the Lease Amendment,

---

[1]    While there was some confusion at trial as to whether the meeting took place on March 2, 2010 or March 10, 2020, see Connor Tr. 295; Nolan Tr. 94. A review of the documents, and in particular a letter dated March 7, 2012 that references and memorializes what occurred at the meeting, (Exh. 81) the Court finds that the meeting with Cohen took place on March 2, 2012. See also Exh. 80 (email from Nolan referring to earlier meeting and seeking information as to the status of the Ronkonkoma building permit).

or deficiencies in the building permit application. Instead, the meeting was held to express the County's preference not to go forward with the carport construction at Ronkonkoma, and to discuss whether EDF could shift that project to a different site. <u>See</u> Cohen Tr. 870-75,

117. While EDF was not contractually bound to engage in such alternative site discussions, it nevertheless discussed the possibility of such alternative sites with the County. Nolan Tr. 97-98; Connor Tr. 281-82.

118. No alternative site suggested or explored was ever a viable option, and none was ever agreed upon.

119. While EDF collaborated with the County in identifying possible sites as an alternative to Ronkonkoma, EDF never agreed to forego construction at that site. Instead, EDF continued to press for issuance of the building permit so that Ronkonkoma construction could move forward. <u>See</u> Exh. 81; Cohen Tr. 875-76.

120. As late as April of 2012, Connor continued to ask the County as to the status of the Ronkonkoma building permit. Exh. 84; Cohen Tr. 880-81; Connor Tr. 279. Cohen was made aware of this request but did not respond. Cohen Tr. 881.

121. Cohen never expressed to EDF that the Ronkonkoma project was not going forward because of any problem with the provision of alternate parking. Cohen Tr. 877.

122. After the January 2012 Meeting, and even after becoming aware of the Ronkonkoma Lease Agreement, the County took no action to cooperate with EDF in its effort to secure a building permit for the project. Nor did the County take any effort to cooperate with EDF in the process to arrange for an alternative parking site during construction.

123.    The referral to the County Attorney's office for direction as to the construction of a carport site represented a departure from past practice which involved neither the County Attorney's office nor the office of the County Executive in the building permit process.  Monaghan Tr. 477. Indeed, neither the County Attorney nor the County Executive are charged with playing any role in the building permit process.  Instead, such matters are considered solely by DPW which is charged with issuing permits according to law.

124.    The County's January 2012 change in position, which occurred after the January 2012 Meeting, was motivated solely by the desire to accommodate the request made by the Ronkonkoma hub developer and the Brookhaven Town Supervisor not to proceed with the Ronkonkoma carport project. This is evidenced clearly by documents showing the County's intent, under the Bellone administration, not to go forward with the Ronkonkoma project. The County's intent was more than a "preference;" it was a clear decision not to go forward with the County's contractual obligations pursuant to the Ronkonkoma Lease Agreement.

125.    The Court rejects, as not credible, testimony that the decision not to grant EDF a building permit to begin construction at Ronkonkoma was based upon any failure of EDF to provide appropriate alternative parking or a phasing plan.  Instead, that decision was based completely upon the Bellone administration's decision not to go forward with the Ronkonkoma project.

126.    The Court recognizes that neither the Ronkonkoma Lease Agreement nor any of the other Lease Agreements required the issuance of building permits.  Nor did these agreements require that the County relax any requirements for the issuance of such

permits. All of the Lease Agreements (including the Ronkonkoma Lease Agreement) did, however, require that the County act in good faith and cooperate with EDF with respect to the issuance of any such permit. While the County engaged in such good faith cooperation with EDF with respect to the six solar carport projects that were ultimately completed, it failed to do so with respect to the Ronkonkoma Site.

127.     The Court finds, as a matter of fact, based upon witness testimony and documentary evidence presented, that the County failed to cooperate with EDF in its efforts to secure a building permit and comply with its contractual duty to provide alternative parking during construction. Indeed, the County's unilateral decision, reached after the Bellone administration decided not to support the building of carports at the Ronkonkoma Site, made contractual compliance by EDF impossible.

CONCLUSIONS OF LAW

I.     <u>The Basis of EDF's Breach of Contract Claim</u>

1.   EDF makes clear that the damages sought here are not for profits lost as a result of failing to provide the maximum megawatts as set forth in the PPA. Nolan Tr. 112.

2.   The damages sought by EDF here are for sub-costs affiliated with cutting the carport program short. Such damages are only those costs attributable to the Ronkonkoma project. Nolan Tr. 113.

3.   The contract forming the basis of this action is the Lease Agreement dated March 22, 2010, for the Ronkonkoma project. EDF seeks damages for the County's breach of its contractual obligation to cooperate in accord with Section 35 of that agreement ("Section 35"). <u>See</u> <u>e.g.</u>, Pl. Exhs. 4, 5, 6 at 28.

4. Prior to assessment of the breach of contract issues the court addresses two legal issues raised by the County: (1) whether the proper procedure for the relief sought by EDF was commencement of a proceeding pursuant to Article 78 of the CPLR and not an action for breach of contract and (2) whether EDF breached the contractual requirement that it provide the County with notice and an opportunity to cure any breach.

II.   <u>EDF Was Not Required To Pursue its Claim as an Article 78 Proceeding</u>

5. The court rejects the argument that this matter was required to be pursued via an Article 78 proceeding.  Where, as here, the damage alleged arises from an alleged breach of contract, New York holds clearly that the claim is properly resolved via an action for breach of contract and not an Article 78 proceeding. <u>Abiele Contracting Serv. v. New York City School Const. Authority</u>, 91 N.Y.2d 1, 8, 666 N.Y.S.2d 970, 689 N.E.2d 864 (1997); <u>Steve's Star Service, Inc. v. County of Rockland</u>, 278 A.D.2d 498, 499, 718 N.Y.S.2d 72, 74 (2d Dep't 2000); <u>93 Ralph, LLC v. New York City Housing Auth. L. Dep't.</u>, 41 Misc.3d 692, 698, 971 N.Y.S.2d 412, 417 (Civil Court, Kings County 2013). As an action to redress breach of a particular contractual provision, this matter was therefore properly commenced as a breach of contract lawsuit.

6. Nor would an Article 78 proceeding lie in this matter. EDF's action here is not based on the failure to comply with a ministerial act of issuing a building permit.  Instead, it is an action alleging that the County failed to comply with a particular contractual provision, <u>i.e.</u>, the duty to cooperate as set forth in Section 35 of the Lease Agreement.  As such, any Article 78 proceedings would have been properly dismissed.  <u>E.g.</u>, <u>Steve's Star</u>, 278 A.D.2d at 499 (reversing award granted in context of Article 78 proceeding on ground that action for amounts due under a contract should have been pursued as a breach of

contract action); <u>see</u> <u>also</u> <u>Kerlikowske v. City of Buffalo</u>, 305 A.D.2d 997, 997, 758 N.Y.S.2d 739, 740 (4th Dep't 2003) (Article 78 proceeding in the nature of mandamus appropriate only where petitioner seeks to compel the performance of a purely ministerial act).

7. The Court rejects the County's arguments to the contrary. Indeed, no case cited by the County requires an allegation alleging breach of contract with a municipality to be brought pursuant to Article 78. Instead, such actions are properly commenced as plenary actions for breach of contract.

III.   <u>EDF Did Not Breach the Contract by Failing to Give Notice and Cure Opportunity</u>

8. The Court also rejects the argument that EDF breached the lease agreement or is otherwise precluded from commencing this lawsuit on account of its failure to give the County notice and an opportunity to cure.  In support of this argument the County relies upon Section 27.11 of the Lease Agreement ("Section 27"). Section 27 states, in pertinent part, that if the County fails to "observe each and every . . . agreement" set forth in the Lease Agreement, "within thirty (30) Days after receipt of written notice of default hereunder from [EDF] . . .the same shall constitute a default on the part of the County for which [EDF] shall have all rights available under law."  Exh. 5 at 26.

9. The County construes Section 27 as imposing a condition precedent for commencement of a breach of contract lawsuit. EDF, on the other hand, argues that Section 27 creates no such condition, and instead sets forth only a set of circumstances under which EDF could terminate the Lease Agreement based upon the County's default.  The Court agrees with EDF's interpretation of Section 27 and holds that it creates no condition precedent for commencement of an action for breach of contract.

10. Notably, Section 27 does not state that notice of default and a 30 day opportunity to cure such default must pass prior to institution of a lawsuit. The plain language states only that failure to cure after such notice shall constitute default, "for which [EDF] shall have all remedies under law." Under New York law "it must clearly appear" from the parties' agreement itself that they intended a notice provision such as Section 27 to operate as a condition precedent to suit. Notice and cure provisions that have been held to create conditions precedent state, without equivocation, that failure to comply therewith preclude commencement of any action for damages. Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd., 2013 WL 4409434 * 21 (E.D.N.Y. 2013), report and recommendation affirmed in relevant part, 2013 WL 5502852 (E.D.N.Y. 2013).

11. If contractual language referring to notice of non-compliance "is in any way ambiguous, the law does not favor a construction which creates a condition precedent." Mahoney v. Sony Music Entertainment, 2013 WL 491526 * 6 (S.D.N.Y. 2013) (quoting Kass v. Kass, 235 A.D.2d 150, 159, 663 N.Y.S.2d 581, 588 (2d Dep't 1997)(citations omitted), aff'd, 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998). The Court declines to read language into the Lease Agreement that is not there and declines therefore to hold that Section 27 creates a condition precedent to suit.

12. Further, this Court agrees with courts that have refused to interpret similar language as creating conditions precedent to suit. See e.g., IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F.Supp.2d 395, 402-03 (S.D.N.Y. 2009); IXE Banco, S.A. v. MBNA America Bank, N.A., 2008 WL 650403, *11 (S.D.N.Y. 2008); see also Spanski Enters., Inc., v. Telewizja Polska, S.A., 2013 WL 81263 *12 (S.D.N.Y. 2013).

13. The Court holds further that even if Section 27 could be interpreted as a condition precedent to commencement of an action, under the facts here such notice would have been nothing more than an exercise in futility.

14. The facts at trial established that following the January 2012 Meeting, the County made the decision not to go forward with its obligations under the Lease Agreement. Written notice that such decision was considered by EDF as a breach of the contractual cooperation agreement would neither have changed that decision not result in different action by the County. Indeed, the County's actions in attempting to agree upon an alternative site for carport construction are precisely what would have happened if EDF had made served some formal notice of breach on the County, rather than the County attempting to take the first steps towards construction at a location in lieu of Ronkonkoma. Under these factual circumstances, any notice by EDF, even if required (which the Court holds was not) would have been futile and unnecessary. See Giuffre Hyundai Ltd. v. Hyundai Motor America, 756 F.3d 204, 208 (2d Cir. 2014) ("New York common law does not require a chance to cure "when 'doing so would amount to a useless gesture.'" (citation omitted)).

15. The Court holds that the Lease Agreement did not impose a notice and opportunity to cure as a condition precedent to suit and, even if it did, such requirement is excused under the circumstances in this case as futile. Having rejected the County's preliminary arguments the Court turns to decide whether EDF prevails on its claim for breach of contract.

IV.   The County Breached Section 35 of its Contract with EDF

16. EDF's breach of contract claim asserts that the County breached the duty to cooperate as set forth in Section 35 of the Lease Agreement pertaining to carport construction at Ronkonkoma.

17. Section 35 requires, <u>inter alia</u>, that the County "fully support and cooperate with [EDF] in the conduct of its operations and the exercise of its rights" under the Lease Agreements. This duty of cooperation is stated to include cooperation with EDF's efforts to "obtain from any "Governmental Authority . . . or entity any environmental impact review, permit, entitlement [or] approval." Pl. Exh. 5 at 28.

18. Section 35 further states that the County "shall not oppose, in any way, either directly or indirectly, any application by [EDF] for any permit, approval or entitlement in accordance with the terms and conditions of [the Lease Agreements] at any administrative, judicial, legislative or other level." Pl. Exhs. 4-6 at 28

19. To prevail on its breach of contract claim under New York law EDF must establish: (1) the existence of a contract; (2) EDF's performance under the contract; (3) breach of contract by the County and (4) damages. <u>Cacchillo v. Insmed, Inc.</u>, 551 F. App'x 592, 593-94 (2d Cir 2014) (quoting <u>Harsco Corp. v. Sequi</u>, 91 F.3d 337, 348 (2d Cir. 1996).

20. The first element of existence of a contract is clearly established by introduction of the March 22, 2010 Lease Agreement.

21. As to the second element, the Court holds that EDF has performed as required under the agreement. As set forth above, EDF did not breach any duty to perform under the Lease Agreement.

22. The Court rejects the argument that EDF breached any duty under the Lease Agreement by failing to come forward with a parking mitigation plan and/or an appropriate phasing

plan as required under the Lease Agreement. To the contrary, the facts at trial establish that EDF did all that it could possibly do to accommodate the need for such a plan, and thereby performed as required under the Lease Agreement.

23. Early in the process EDF recognized the need for alternative parking. It made suggestions and ultimately, at the County's suggestion, focused on the Alternative Parcel as the alternative parking solution. EDF stood ready and willing to comply with any additional requirements necessary for use of that parcel, including an agreement to expend resources necessary to clear the area. In response, the County argues simply that EDF's efforts were insufficient and amount to a failure to comply with its contractual responsibilities. In fact, it was not EDF that failed to comply with its responsibility to offer a parking mitigation plan. It was the County that failed to cooperate with EDF to bring that plan to fruition.

24. The County's failure to cooperate with EDF in connection with the provision for alternative parking and, indeed, in the overall permitting process with respect to the Ronkonkoma construction satisfies the third element of EDF's breach of contract claim, i.e., that the County breached the Lease Agreement.

25. Following the January 2012 Meeting, the County made the decision to stop all efforts to cooperate with EDF, and thereby breached the duties specifically imposed by Section 35. In particular, the evidence at trial established that the County simply ceased all cooperation with EDF. Moreover, the failure to cooperate departed from the contractual cooperation requirement as established by the parties' course of dealing with respect to its prior dealings. While initially enthusiastic about the Alternative Parcel as the parking mitigation plan, the County abandoned cooperation with respect to that plan, leaving EDF

wondering as to what step to take next. The County similarly acted to stop its cooperation with respect to issuance of EDF's building permit. Indeed, every action taken by the County after the January 2012 Meeting, including evading EDF's phone calls and requests for information, and failing to collaborate on a previously agreed upon parking plan, was aimed at frustrating, rather than furthering, the process.

26. Rather than acting to cooperate with EDF, the County expended all of its efforts to determine the consequences of a breach. While it is certainly within the realm of good business judgment to consider the risks and benefits one's actions (or failure to act) the County's documents in this case support a finding that after the January 2012 Meeting its focus was on assessing the risks of inaction, rather than on fulfilling its duty to cooperate under the Lease Agreement. In sum, the evidence showed that the County acted with eyes wide open and failed to "fully support and cooperate with [EDF] in the conduct of its operations and the exercise of its rights" under the Lease Agreements." The County further failed, in violation of Section 35, to cooperate with EDF's efforts to obtain a building permit.

27. For the foregoing reasons, the Court holds that EDF has proven that the County breached the Lease Agreement. The Court therefor turns to assess the damages, if any, due to EDF as a result of the breach.

V.  Damages: Legal Standards

28. EDF seeks reliance damages as a result of the County's breach. Specifically, it seeks to recoup amounts reasonably expended in anticipation of the Ronkonkoma construction, minus amounts received in mitigation of losses actually sustained.

29.  "New York allows a party to recover 'damages based on his reliance interest, including expenditures made in preparation for performance or in performance.'"  Nature's Plus Nordic A/S v. Natural Organics, Inc., 645 F. App.'x 25, 28 (2d Cir. 2016) (quoting St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth., 13 N.Y.3d 204, 208, 889 N.Y.S.2d 534, 535, 918 N.E.2d 124 (2009)); Farash v. Sykes Datatronics, Inc., 59 N.Y.2d 500, 504, 452 N.E.2d 1245, 465 N.Y.S.2d 917 (1983) ("[T]he injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.") (citations omitted).

VI.    Damages Testimony

30. In support of its reliance damages claim, EDF presented the expert testimony of Sebold. Sebold's conclusions are set forth in her expert report. Exh. 93.

31. Sebold is a CPA, employed by BDO USA, LLP, a public accounting firm.  Sebold Tr. 352.  Sebold is the managing director of the consulting practice and specializes in forensic accounting and litigation consulting.   Sebold Tr. 352-53.  Sebold is licensed to practice in New York and California.  Sebold Tr. 352.

32. In opposition to EDF's damages claim, the County presented the testimony of Smith to testify as an expert in the field of "solar energy systems design, engineering and procurement."  Smith Tr. 721

33. Smith is Associate Vice President if SUNY Stony Brook and Chairman of the University's Advanced Energy Center.  Smith Tr. 715.  Smith is also President and Chief

Technology Officer of Bison Technologies, Inc., which focuses on the development and implementation of utility scale solar energy projects.  Smith Tr. 715.

34. Smith testified that in connection with his role in Bison Technologies, Inc., he consults in the utility scale solar arena, where he acts as the chief architect of the systems, as well as the solar analyst and financial analyst in some cases.  Smith Tr. 718-19.  He testified that he designed over a gigawatt of solar installations and has approximately 600 megawatts of solar energy power being generated from systems for which he was the architect.  Smith Tr. 721, 733.

35. Sebold testified that after meeting with EDF and receiving an overview of the matter and reviewing and analyzing all the documentation, she drafted a report dated February 9, 2015 (the "Report"), which calculated damages through December 31, 2014, and an addendum to the report dated April 29, 2016 (the "Addendum"), which calculated damages through April 30, 2016.  Sebold Tr. 355-58.

36. The Report calculated $11,656,951 in damages through December 31, 2014.  Pl.'s Ex. 93; Sebold. Tr. 357.  The Addendum damages calculation showed a decrease, to $10,475,091.  Pl.'s Exh. 107; Sebold Tr. 357-58.  Sebold explained that decrease was attributable to a few reasons, including additional mitigation between January 1, 2015 and April 30, 2016, additional interest that accrued during that period, and an adjustment based on the most recent inventory count of remaining solar modules which changed the calculation.  Sebold. Tr. 358; Pl.'s Exh. 107.

37. Sebold explained that she calculated the damages by looking at the cost incurred by EDF in the course of the Ronkonkoma project.  Sebold. Tr. 359.  Sebold testified that she reviewed the costs incurred with the solar panels and the cost relating to the steel, as well

as to other out-of-pocket costs.  Sebold. Tr. 359.  Sebold explained she then calculated interest and offset it all by the mitigating factors.  Sebold Tr. 359.

38. Sebold testified as to her method of allocation of costs. She testified that exclusive of construction costs, the costs for all seven sites was approximately $40 million.  Sebold Tr. 360.  From that number, Sebold used several methods to allocate specific damages to the Ronkonkoma site.  Sebold Tr. 360--61.  For example, if the invoices were not specific to Ronkonkoma, Sebold conservatively assigned 1/7 of the costs to the Ronkonkoma site since there were seven sites, even though Ronkonkoma represented 1/3 of the entire project.  Sebold Tr. 361; see also Pl.'s Exh. 93 p 7, 9-12.

39. Sebold testified that she established a blended rate of $1.57 per watt for the solar panels purchased by EDF by looking at each of the invoices and the number of panels that were purchased, and then calculating what the average price per watt was on each of the invoices.  Sebold Tr. 384-85.

40. Sebold testified that she calculated the amount of damages with respect to solar modules to be approximately $7.4 million attributable to the Ronkonkoma site.  Sebold Tr. 362; Pl.'s Exh. 93, 94.  Sebold explained that after reviewing all the invoices representing the purchases of solar panels for all seven sites, the total spent was $17 million.  Sebold Tr. 363. Sebold then deducted the $12,819,000 plus used in the first six projects and was left with $4.7 million plus attributable to Ronkonkoma.  Sebold Tr. 363-64.  Sebold then multiplied the $4.7 times the $1.57 to arrive at the total cost of $7,431,000 million for Ronkonkoma.  Sebold Tr. 364.

41. Sebold testified that she determined the amount of damages attributable to Ronkonkoma for the purchase of steel was approximately $2.2 million.  Sebold Tr. 364.  Sebold

explained that she was able to determine this by reviewing the invoices for the contractor total material cost of steel, as well as the contractor's steel. Sebold Tr. 364; Pl.'s Exh. 93. This allowed her to come up with a contracted per watt cost of $0.36 for Ronkonkoma, by dividing the 2.7 million by the 7.5 million contracted wattage amount. Sebold. Tr. 364.

42. Sebold testified that although the Ronkonkoma contract called for 7.5 million watts, by reviewing the actual Ronkonkoma design documents, she was able to find out that the site was only designed for 6.3 million. Sebold Tr. 364-65. Sebold explained that is how she arrived at the 2.273 million calculation. Sebold Tr. 365.

43. Sebold testified that she allocated $25,000 for the storage of the solar modules and $3,600 for the storing of steel at the Ronkonkoma site. Sebold Tr. 365; Pl.'s Exh. 93.

44. Sebold further testified that she calculated damages attributable to Ronkonkoma from June 15, 2012 forward because that was the date by which it was clear that there would be no way to be able to complete the project by the December 31, 2012 date. Sebold Tr. 365.

45. Smith opined that as both an expert in the procurement of solar panels and materials and someone who has been personally involved with the negotiation, procurement and installation of 100 MWdc of solar panels, he "would not order the material until I had all permits in hand," and that "solar panels are bought in advance of a project" and "it's not industry practice to buy in advance." Smith Tr. 721, 731-35, 778, 812.

46. Smith testified that he did not believe there was a legitimate business reason for EDF to purchase the solar panels and steel in advance of obtaining a building permit for the Ronkonkoma site. Smith Tr. 721, 731-35, 786-87, 812. Smith further opined that he did

not believe there was a shortage of solar panels in and after 2010 which necessitated EDF's purchase of all the solar panels prior to the start of the projects. Smith Tr. 731-33, 736-38, 780-82, 809.

47. Smith was shown two industry articles from 2010 during cross-examination which discussed that there was a global shortage of solar panels. Smith Tr. 781-83.

48. This Court rejects as neither credible nor supported by any independent evidence Smith's opinion that EDF should not have procured all of the solar panels prior to obtaining the necessary permits as not credible. Instead, this Court finds that EDF demonstrated legitimate business reasons for purchasing the solar panels prior to the start of the project, namely the concern of an impending global shortage of solar panels, and the parties' understanding that construction would begin on the sites prior to obtaining the necessary permits.

49. Sebold testified that prior to factoring in any mitigation efforts on behalf of EDF and any interest charge, the total amount of damages attributable to the Ronkonkoma site was $10,590,494. Sebold. Tr. 367; Pl.'s Exh. 90.

50. Sebold testified that she then mitigated damages by deducting $904,890 due to an internal EDF transfer of solar panels to a project being constructed in Hawaii in September 2012. Sebold. Tr. 368. Sebold explained that the original per watt purchase price was $1.57, and that it was transferred at $0.65 per watt. Sebold Tr. 368.

51. Sebold further testified that $588,000 was mitigated for the sale of the solar modules. Sebold Tr. 369.

52. Smith testified that all of EDF's modules could have been resold for $0.88 per watt, which was the going rate for new modules. Smith Tr. 805-07. However, Smith further

testified that because the modules had reduced warranties because they were approximately two years old at the time it was clear the Ronkonkoma site was not going forward, and are less valuable than new modules with full warranties that can be bought from a manufacturer, the market rate of $0.88 per watt would have had to been reduced. Smith Tr. 790-791, 805-07.

53. This Court rejects Smith's testimony regarding the per watt market price for EDF's remaining modules and finds that $0.88 per watt for the modules is inappropriate and unreasonably high.

54. Sebold testified that she allocated $489,608 to the Ronkonkoma site for the sale of the steel which occurred in March 2013.  Sebold Tr. 369.  Sebold explained that the entire sale price was $949,958, but after analyzing the amount of steel in inventory relating to Ronkonkoma, as compared to the amount of excess steel inventoried, the amount that was represented related to Ronkonkoma was 51.54 percent. Sebold Tr. 369.

55. Sebold testified that as of December 31, 2014, there was a total mitigation of $1,077,000. Sebold Tr. 370.

56. Sebold testified that she then applied a prejudgment interest rate of nine percent because EDF's counsel asked her to use that rate.  Sebold Tr. 370.

57. Sebold's Report showed that EDF incurred $11,656,951 in total damages through December 31, 2014.  Sebold. Tr. 370.

58. Sebold testified that prior to trial she updated the original report to include further mitigation efforts on behalf of EDF.  Sebold Tr. 370-71.

59. Sebold testified that the addendum dated February 9, 2016, calculated damages through April 30, 2016.  Sebold Tr. 371.  The addendum reflected additional mitigation as a result

of post December 31, 2014 solar panel sales as well as an internal transfer of a solar

panels.  Sebold Tr. 371-72; Pl.'s Exh. 107.

60. With respect to mitigating sales, there were a total of four sales of solar panels to third

parties, and one internal transfer of solar panels during 2015.  Sebold Tr. 372.  The panels

were sold to the third parties at a rate of $0.40 cents, and internally transferred at a rate of

$0.46.  Sebold. Tr. 373.

61. Sebold testified that the total amount of additional mitigation by EDF from the December

31, 2014 to April 30, 2016 was $1,755,515.  Sebold Tr. 373.

62. Sebold testified that she also brought the interest current to April 30, 2016, which added

$920,280 in interest.  Sebold Tr. 374.

63. Sebold testified that she discovered a discrepancy in the amount of solar panel wattage

remaining after starting with original wattage and deducting the watts that were internally

transferred in September 2012, and for the five sales and/or transfers which occurred in

2015.  Sebold Tr. 374-75.  Sebold determined that there should have been 205,155 watts

remaining.  Sebold Tr. 375.

64. However, EDF informed Sebold that after conducting a recent inventory there were only

41,895 watts remaining.  Sebold Tr. 375.

65. Sebold opined that the missing panels could be due to anything, such as being lost, or

even damaged in Hurricane Sandy. Sebold Tr. 375.  Sebold further opined that over 95%

of the panels purchased for Ronkonkoma were actually sold in mitigation of damages.

Sebold Tr. 375-76.

66. Sebold testified that although she could have left her calculations undisturbed after being

told about the missing inventory, since the panels and watts were actually purchased for

the Ronkonkoma site, she opted not to.  Sebold Tr. 376.  Sebold explained that she

calculated the dollar amount for the missing wattage and deducted that amount.  Sebold

Tr. 376.

67. Sebold further testified that she also went back to the June 15, 2012 date and deducted

any interest on those panels from June 15, 2012 through April 30, 2016.  Sebold Tr. 376.

68. Sebold testified that the result was a $346,625 reduction in the initial damages

calculation.  Sebold Tr. 376. Sebold opined that according to her calculations the total

amount of damages incurred by EDF attributable to the Ronkonkoma site as of April 30,

2016 was $10,475,091.

VII.    Damages Conclusions

69. Based on Sebold's testimony, this Court finds that EDF's method of calculation of

damages was appropriate.

70.  Sebold's credible testimony, which was supported by invoices and proof of payment,

establish that EDF's damages consist primarily of its purchase of the solar panels and

steel for the Ronkonkoma site.  See Pl's. Exh. 93-95, 97-105, 107-108.

71. The County did not offer persuasive evidence to support its theory that EDF should not

have ordered the solar panels and steel in advance of obtaining a building permit for he

Ronkonkoma site.  In fact, this Court finds that commencing work on a site prior to

obtaining a permit was the parties' ordinary course of business, and that evidence

supports that an impending global shortage of solar panels was discussed in 2010.  Smith

Tr. 781-83.

72.  The Court holds that EDF is entitled to reliance damages for the money it expended on

the purchase of solar panels, steel, and other development costs for the Ronkonkoma site.

73. The Court accepts Sebold's opinion that EDF suffered $10,475,091 in damages after mitigation and prejudgment interest are accounted for.  Pl.'s Exh. 107.

VIII.  <u>Mitigation</u>

74. The County asserts that EDF failed to mitigate its damages for the panels.

75.  The breaching party must show that the plaintiff unreasonably failed to minimize damages.  See <u>Fed. Ins. Co. v. Sabine Towing & Transp. Co., Inc.</u>, 783 F.2d 347, 350 (2d Cir. 1986).  "However, if the course of action chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have avoided further damage."  <u>Id.</u> at 350 (explaining that the issue is not whether plaintiff chose the path most likely to prevent future damage, but whether plaintiff's decision was reasonable under the circumstances); <u>see also</u> <u>Aristocrat Leisure Ltd. v. Deutsche bank Trust Co. Ams.</u>, 618 F. Supp. 2d 280, 306 (S.D.N.Y. 2009); <u>LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.</u>, 47 A.D.3d 103, 108 (1st Dep't 2007) ([i]f plaintiff reasonably made such diligent efforts to mitigate, it does not matter if, in retrospect, another better means of limiting the financial injury was possible.") (citations omitted).

76. The Court finds Smith's testimony concerning the secondary market for solar panels is not credible and rejects his assertion that EDF could have sold all of its solar panels immediately on the day of the breach at the original purchase price.  Smith Tr. 790-91.

77. The Court similarly rejects Smith's testimony regarding the sale of steel as not credible. The County offered no evidence to support Smith's theory that Baja Construction, the company from which the steel was obtained, would have repurchased the steel.  Smith Tr. 786.  In fact, the County failed to set forth any evidence or testimony as to whether EDF

actually made such an offer to Baja Construction or how EDF ultimately came to sell the steel. Accordingly, the Court finds that the County has failed to satisfy its burden of establishing unreasonable mitigation.

IX.  Pre-Judgment Interest

78. EDF seeks pre-judgment interest at the New York statutory rate of 9% per annum.

79. "Where prejudgment interest is sought on a claim brought pursuant to state law in a federal diversity action, the award is a substantive issue that is governed by state law." Harbinger F & G, LLC v. OM Grp. (UK) Ltd., 2015 WL 1334039, at *34 (S.D.N.Y. Mar. 18, 2015); Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999) (citations omitted)(explaining that pre-judgment interest is a matter of substantive law).

80. Here, Section 5001 of the CPLR governs the calculation of pre-judgment interest and Section 5004 of the CPLR sets a statutory interest rate of nine percent per annum. See Hernandez v. NJK Contractors, Inc., 2015 WL 1966355, at *50 (E.D.N.Y. May 1, 2015). Further, "[u]nder § 5001, prejudgment interest on damages in a case for breach of contract is mandatory." Harbinger F & G, LLC, 2015 WL 1334039, at *35.

81. "[T]h[e Second Circuit] and the New York Court of Appeals have repeatedly reiterated the mandatory nature of prejudgment interest under § 5001(a) in non-equitable contract [ ] cases." Arizona Premium Fin. Co. v. Employers Ins. of Wausau, of Wausau Am Mut. Co., 586 F. App'x. 713, 717 (2d Cir. 2014); see e.g., New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 607 (2d Cir. 2003) (quoting Rule 5001(a)); D'Addario & Co., Inc. v. Embassy Indus., Inc., 20 N.Y.3d 113, 957 N.Y.S.2d 275, 980 N.E.2d 940, 942 (2012) (quoting Rule 5001(a)); World of Boxing v. King, 107 F. Supp.

3d 265, 272 n. 34, 2015 WL 427225, at *5 n. 34 (S.D.N.Y. February 2, 2015) ("It is black

letter New York law that parties that prevail on breach of contract claims are

presumptively entitled to collect prejudgment interest in addition to contract damages.").

82. "The purpose of prejudgment interest is to compensate parties for the loss of the use of

money they were entitled to receive, taking into account the 'time value' of

money." Kassis v. Teachers' Ins. & Annuity Ass'n, 13 A.D.3d 165, 165, 786 N.Y.S.2d

473, 474 (1st Dep't 2004) (citation omitted); McCoy v. Goldberg, 810 F. Supp. 539, 547

(S.D.N.Y.1993) ("The intent of awarding prejudgment interest under CPLR § 5001 is to

compensate an aggrieved party for damages due to the loss of the use of money or its

equivalent, or a loss of the opportunity to realize a fair return on that money.").

83. There must be additional circumstances and facts for the Court to vary from the

"presumptively fair rate" of 9% per annum. Sassoonian v. City of New York, 178 Misc.

2d 660, 662 (Sup. Ct. N.Y. Cty, Sept. 28, 1998) (citing Rodriguez v. New York City

Housing Auth., 91 N.Y.2d 76, 81 (1997), aff'd, 261 A.D.2d at 319.

84. The County has presented no evidence for the Court to depart from the statutory

prejudgment interest rate of 9% per annum. Accordingly, the Court finds that the 9% per

annum rate is fair and reasonable.

CONCLUSION

For the foregoing reasons the Court holds that Plaintiff has prevailed in its action for

breach of contract. The breakdown of such damages is set forth in the table below.

After mitigation, and including statutory prejudgment interest at 9%, the Court finds that EDF's

total damages are $10,475.91, allocated as follows:

| Cost Category | Amount | Total |
|---|---|---|
| Solar Modules | $7,431,416 | |
| Foundations: Array Foundations(Steel) | $2,273,040 | |
| Project Costs: Related to Carport Structures | $451,012 | |
| Storage of Steel Modules | $25,825 | |
| Storage of Steel | $3,654 | |
| Design & Engineering: Development | $241,942 | |
| Legal: Project Development | $53,381 | |
| Consulting: Geotechnical Reporting | $48,408 | |
| Lease Pre-Payment | $21,472 | |
| Legal Fees | $3,193 | |
| **TOTAL OUT-OF-POCKET COSTS** | $10,590,494 | |
| Prejudgment Interest as of 12/31/2014 | $2,144,244 | |
| Mitigation as of 12/31/2014 | -$1,077,787 | |
| | | **$11,656,951** |
| **Additional Prejudgment Interest (1/1/2015 -4/30/2016** | | |
| Solar Module Contract | $657,602 | |
| Steel for Array Foundations | $214,012 | |
| Interest on All Other Costs | $48,666 | |
| | | **$920,280** |
| **Additional Mitigation (1/1/2015-4/30/2015)** | | |
| Sale and Transfer of Solar Modules | -$1,755,515 | **-$1,755,515** |
| Variance in Solar Module Inventory | -$256,997 | |
| Prejudgment Interest | -$89,628 | **-$346,625** |
| **TOTAL DAMAGES** | | **$10,475,091** |

In view of the fact that the damage calculation above includes prejudgment interest only through April 30, 2016, Plaintiff is directed to submit a final judgment for review by this Court within two weeks of the date of these findings of fact and conclusions of law so that final judgment can be entered in this matter.

SO ORDERED.

_____
ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE

Dated:  Central Islip, New York
        November 17, 2016